17-3337-cr
United States v. Balde

**UNITED STATES COURT OF APPEALS**
FOR THE SECOND CIRCUIT

August Term, 2018

Argued: November 6, 2018     Decided: November 13, 2019

Docket No. 17-3337-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

SOULEYMANE BALDE,

*Defendant-Appellant.*

B e f o r e:

HALL and LYNCH, *Circuit Judges,* and GARDEPHE, *District Judge.*[*]

---

[*] Judge Paul G. Gardephe, of the United States District Court for the Southern District of New York, sitting by designation.

Souleymane Balde, a citizen of Guinea, appeals his conviction of one count of unlawful possession of a firearm by "an alien . . . [who] is illegally or unlawfully in the United States," in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). In a prior opinion, this Court rejected Balde's arguments that, first, at the time he possessed the firearm, he was not "in" the United States because he had not "entered" the United States as that term is defined for the purposes of immigration law, and second, that even if he was "in" the United States, he was not present "illegally or unlawfully" because he had been paroled. We affirmed the judgment of the district court.

Balde now petitions for rehearing based on the Supreme Court's recent opinion in *Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019), which held that in prosecutions pursuant to 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), the government must prove that the defendant not only knowingly possessed a firearm, but also knew that he or she was unlawfully in the United States. We conclude that the indictment's failure to allege explicitly that Balde knew he was unlawfully in the United States was not a jurisdictional defect. But, because Balde has demonstrated plain error in the acceptance of his guilty plea, we GRANT his petition for rehearing and WITHDRAW our prior opinion. We reiterate our initial holdings, but VACATE Balde's conviction and REMAND for further proceedings consistent with this opinion.

———————————

MATTHEW B. LARSEN, Federal Defenders of New York, New York, NY, *for* Defendant-Appellant Souleymane Balde.

ELINOR TARLOW, Assistant United States Attorney (Anna M. Skotko, Kiersten Fletcher, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

———————————

GERARD E. LYNCH, *Circuit Judge*:

Souleymane Balde pled guilty to unlawful possession of a firearm by "an alien . . . [who] is illegally or unlawfully in the United States," in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). We initially upheld his conviction, rejecting Balde's invitation to interpret "in" to mean "entered into" as the latter term is used in immigration law, and concluding that, being physically present in the United States without having been paroled into the country or otherwise given a legal status, Balde was properly considered to be "illegally or unlawfully in the United States" within the meaning of § 922(g)(5)(A).

Eight days after our opinion in this case, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019), holding that, to obtain a conviction pursuant to 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), the government must prove that the defendant not only knowingly possessed a firearm, but also knew that he or she was "illegally or unlawfully in the United States" at the time he or she possessed the firearm. Balde now petitions for rehearing, arguing that his guilty plea was accepted in error, because he was not advised of the additional knowledge requirement announced in *Rehaif*, and the record does not contain facts sufficient to satisfy that element of the offense. He asserts that, whatever his

3

legal status at the time he possessed the firearm, he did not *know* at that time that he was in the United States illegally, and that he therefore is not guilty of violating 18 U.S.C. § 922(g)(5)(A).

Because we conclude that Balde has demonstrated a reasonable probability that he would not have pled guilty to violating § 922(g)(5)(A) as interpreted by the Supreme Court in *Rehaif*, we GRANT Balde's petition and withdraw our prior opinion. We reiterate that opinion's holdings, but VACATE Balde's conviction and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

Souleymane Balde is a citizen of Guinea. He first arrived in the United States as a child, without lawful immigration status. In May 2005, Balde sought to adjust his status to become a lawful permanent resident, apparently pursuant to the terms of a class action settlement agreement.[1] To qualify for adjustment of status, Balde had to be interviewed by the United States Citizenship and

---

[1] Balde asserts that he applied under the LULAC (Newman) settlement agreement. That agreement "allow[ed] for those who meet certain requirements to apply or reapply for Temporary Resident status under the 1986 amnesty program of [8 U.S.C. § 1255]." News Release, USCIS, 2005 WL 1157041 (May 16, 2005) (extending deadline to apply for legalization under the LULAC (Newman) settlement agreement until December 31, 2005); *see also* 8 C.F.R. § 245a.14 (describing procedures for applying for legalization under LULAC and two other class action settlement agreements).

Immigration Services ("USCIS"). His interview was originally scheduled for December 1, 2005.

Several months after applying, however, Balde learned that his mother was seriously ill and that unless he traveled to Guinea to visit her soon, he risked missing his last chance to see her alive. He asked his attorney to postpone the interview in order for him to travel abroad. His lawyer told Balde that he would contact USCIS to postpone the interview. The lawyer wrote to USCIS, stating that Balde would be unable to attend his interview due to unforeseen circumstances. Balde also applied for advance parole, a status which allows a noncitizen to travel abroad temporarily and return to the United States without jeopardizing any existing legal status or pending application for immigration relief. USCIS granted advance parole, but did not act on the request to postpone the interview.

Balde did not appear for his scheduled interview, although USCIS had not granted an adjournment and despite the fact that he did not leave the United States until several weeks after the scheduled interview date. On January 27, 2006, while Balde was out of the country, USCIS denied his application for adjustment of status because he had missed his interview and because it determined that the request for postponement submitted by Balde's attorney did

not demonstrate sufficient reason to postpone it. The agency also revoked Balde's advance parole.

Balde's mother died on January 28, 2006. On March 17, 2006, Balde flew back to New York City and was stopped at John F. Kennedy International Airport, where Customs and Border Protection ("CBP") agents informed him for the first time that his advance parole had been revoked. CBP agents detained Balde and initiated removal proceedings, charging him as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I), which applies to noncitizens seeking admission without a valid visa, passport, or other suitable travel document. In due course, an immigration judge issued an order of removal. Balde appealed, first to the Board of Immigration Appeals ("BIA"), which dismissed the appeal, and then to this Court, which granted a stay of removal pending decision.

While his appeal was pending before this Court and his removal was stayed, Balde sought supervised release from detention. The United States Immigration and Customs Enforcement Agency ("ICE") agreed to grant such release, and notified Balde that he would be released under the Intensive Supervision Appearance Program ("ISAP"). First implemented in 2003, ISAP offers an "alternative[] to detention for final-order aliens" who are unable to be

removed, and provides for electronic monitoring and supervision for program participants. *See Nguyen v. B.I. Inc.*, 435 F. Supp. 2d 1109, 1112–13 (D. Or. 2006).

Following a remand from this Court on consent of the parties, the BIA again denied relief to Balde on December 19, 2008. Balde did not appeal that decision to this Court, and the order of removal became final. Balde's Guinean passport expired around that time, however, and the government was therefore unable to effect his deportation. He remained at liberty, under supervision. Immigration officials modified the terms of that supervision in 2012. At no time, however, did Balde hold a visa or other legal authorization to enter the United States, and he remained subject to a final order of removal.

On December 14, 2015 — seven years after his removal order became final — Balde was involved in a fight in a Bronx delicatessen. During the altercation, Balde pulled out a gun and pointed it at others inside the deli. He then left the premises but later drove back to the deli with another individual and fired a single shot into the air out of the passenger side window.

When officers from the New York City Police Department responded to the scene, witnesses identified the car from which the shot had been fired as it pulled up to a nearby intersection. Police officers pursued and stopped the

vehicle. Balde got out of the car from the front passenger seat, and was quickly apprehended. A police search discovered four cartridges in Balde's jacket pocket, and a revolver under the front passenger seat where Balde had been sitting. Witnesses to the deli altercation later identified Balde as the person who had fired the gunshot.

A grand jury indicted Balde on one count of possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A). He moved to dismiss the indictment. After the district court denied the motion, he pled guilty pursuant to an agreement that preserved his right to appeal the district court's denial of his motion. The district court sentenced Balde to 23 months' imprisonment and two years of supervised release.

Balde appealed that decision, arguing that he was not within the category of persons, individuals "illegally or unlawfully in the United States," who are prohibited from possessing a firearm under 18 U.S.C. § 922(g)(5)(A). Agreeing with the district court's decision concluding otherwise, we affirmed Balde's conviction.

Before time expired for Balde to seek rehearing, however, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019), holding that in

8

prosecutions pursuant to 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2) the government must prove beyond a reasonable doubt that the defendant knew not only that he possessed a firearm, but also that he was unlawfully present in the United States. Because the latter mens rea element had not previously been recognized, the indictment of Balde did not expressly allege it, Balde was not advised of it by the district court at the time of his plea, and the district court did not identify a factual basis for concluding that Balde had such knowledge.

Balde now petitions the Court for rehearing, arguing that *Rehaif* requires the dismissal of the charge against him, or at least, in the alternative, vacatur of his guilty plea.

## DISCUSSION

18 U.S.C. § 922(g)(5)(A) prohibits "an alien . . . illegally or unlawfully in the United States" from possessing a firearm or ammunition. A separate provision, 18 U.S.C. § 924(a)(2), provides that "[w]hoever knowingly violates [18 U.S.C. § 922(g)(5)(A)] shall be fined . . . , imprisoned not more than 10 years, or both."

In his original brief on appeal, Balde argues that at the time of the alleged conduct, he did not fall within the category of persons prohibited by § 922(g)(5)(A) from possessing a firearm for two related reasons: first, that under

his particular immigration circumstances he was not "in" the United States within the meaning of the statute when he possessed the firearm, and second, that even if he was, he was not here "illegally or unlawfully." In our original opinion, decided on June 13, 2019, we rejected both of Balde's arguments and concluded that, given the particulars of his immigration status, he was within the category of individuals prohibited from possessing a firearm under 18 U.S.C. § 922(g)(5)(A).[2] For the reasons set forth in that opinion, and reiterated below, we adhere to those conclusions.

In his petition for rehearing, Balde adds new arguments not addressed in his original appellate briefing or advanced in the district court. Relying on the Supreme Court's decision in *Rehaif*, he argues that his indictment was defective in failing to allege explicitly that he knew that he was illegally present in the United States, and that this purported defect deprived the district court of jurisdiction and requires dismissal of the indictment. Alternatively, he contends that the failure of the district court to advise him that such knowledge was an element of

---

[2] In reaching this conclusion, we reviewed the district court's denial of the motion to dismiss the indictment *de novo*. *See United States v. Kirsch*, 903 F.3d 213, 221 (2d Cir. 2018).

the charged offense, and the absence of evidence establishing a factual basis for finding that he had such knowledge, invalidates his guilty plea.

For the reasons stated below, we reject the first argument.[3] Because we agree with the second, however, we grant the petition for rehearing, withdraw our previous opinion, vacate the judgment of conviction, and remand the case for further proceedings consistent with this opinion.

## I.    "In the United States"

Balde first argues that the prohibition of firearms possession in § 922(g)(5)(A) is not triggered by mere physical presence within the territory of the United States, but instead requires that a "defendant must have 'entered' the country as a matter of immigration law." Appellant's Br. at 17. For the technical purposes of immigration law, Balde notes, he was prevented from "entering" the

---

[3] Balde briefly argues that our original holdings would be mooted if we granted rehearing. But vacating Balde's conviction would only moot the question of whether he falls within 18 U.S.C. § 922(g)(5)(A) if we accepted Balde's first argument and remanded to the district court to dismiss the indictment. We reject that argument, however, and merely vacate Balde's guilty plea and remand for further proceedings, including a possible trial on the indictment. Because the government, at any such trial, would be required to prove both that Balde *was* "illegally or unlawfully in the United States" and that he *knew* that he was here illegally, there remains a live controversy over both elements, and it remains necessary for us to resolve the issues presented in Balde's initial briefing.

United States when he returned in March 2006 and was placed in removal proceedings, and he should therefore be treated as if he were still at the border seeking admission. Because he has never technically "entered" the United States, Balde argues, he was not "in" the United States within the meaning of 18 U.S.C. § 922(g)(5)(A) at the time of the conduct charged in the indictment.

As with most matters of statutory interpretation, we start with the text of the statute. "Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) (internal quotation marks and alterations omitted). "In conducting such an analysis, we review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *Id.* (internal quotation marks omitted).

The plain meaning here is clear. "In" is an ordinary, familiar English word, with a well understood meaning. Its principal definition in the Oxford English Dictionary is "[w]ithin the limits or bounds of, within (any place or thing)." *In,* Oxford English Dictionary (2d ed. 1989); *see also Taniguchi v. Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 566–67 (2012) (relying on dictionary definitions to aid in interpreting

statutory text). Someone arriving to meet a friend might call to say that she was "in the lobby;" she might tell her friend over dinner that she was "in Texas last weekend." It would be clear to the friend in both cases that the speaker meant that she was physically present in those locations at the time she indicated she was "in" them. The plain meaning of the statute reflects that ordinary meaning: a person, citizen or noncitizen, is "in" the United States when he or she is present within its geographic borders. The text is therefore "absent ambiguity" and our analysis presumptively ends there. *Dobrova*, 607 F.3d at 301.

Accepting Balde's argument would invert the normal plain meaning rule of statutory interpretation by substituting a technical term-of-art meaning for the ordinary plain meaning of a straightforward English word. "In" is not a technical term with a special meaning in immigration law. In order to adopt Balde's interpretation, we would have to replace the plain meaning of the statutory phrase "is . . . *in* the United States" with the specialized technical meaning of the different phrase "has *entered* the United States," thus substituting "a specific legal term" within immigration law for the simple words chosen by Congress. *See United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir. 2006).

We decline to do so for four reasons. First, that is simply not the language that Congress chose. The statute uses the ordinary word "in," not the more technical term "entered."

Second, substituting "has entered" for "is in" would change the meaning of the statute, even with respect to one who unquestionably had "entered" the United States in the technical immigration sense of the word. The language defining the crime refers to a noncitizen who "is illegally or unlawfully in the United States." A noncitizen who enters the United States with a visa and overstays the term of that visa is clearly *in* the United States illegally but, at least if his decision to stay was made after his arrival, it would not be correct to say that he had *entered* the United States illegally.

Third, we are interpreting a section of the criminal code that prohibits gun possession by various categories of person, not an immigration provision. Criminal laws are ordinarily written to be understood by the non-specialist individuals who are subject to the law or who serve as law enforcement officers, prosecutors, and jurors, not to be given arcane hidden meanings identifiable only by immigration lawyers — and even by them only by identifying a "ghost" technical term supposedly lurking behind the actual, non-technical words used in

14

the statute. *See, e.g.*, *Mitsui & Co. v. Am. Exp. Lines, Inc.*, 636 F.2d 807, 814 (2d Cir. 1981) ("Legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.") (citations and alteration omitted); *see also Taniguichi*, 566 U.S. at 568 ("That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense.").

Fourth, Congress clearly knows how to import the technicalities of immigration law into the federal criminal code when it so chooses. For example, in the subsection immediately following the one at issue here, Congress prohibited possession of firearms by noncitizens who were "admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act)." 18 U.S.C. § 922(g)(5)(B). The fact that Congress did not choose similar technical language in 18 U.S.C. § 922(g)(5)(A) counsels against interpreting "in" in any manner other than by giving it its plain meaning.

Balde bases his argument almost entirely on *United States v. Lopez-Perera*, a case in which the Ninth Circuit held § 922(g)(5)(A) inapplicable to a defendant

15

who had not "entered" the United States within the meaning of immigration law. 438 F.3d at 936. But the facts of that case are easily distinguishable from those before us. In *Lopez-Perera*, the defendant drove his van from Mexico into the San Ysidro Port of Entry in California, claiming to be a United States citizen. *Id.* at 932–33. At the first checkpoint, an officer directed Lopez-Perera to a secondary inspection area, where he "waited approximately twenty-five minutes . . . and then drove his van toward the north exit of the San Ysidro Port of Entry." *Id*. at 933. Law enforcement officers stopped him before he could leave the area and discovered a revolver in the van. *Id.* Thus, unlike Balde, Lopez-Perera had never left the border area (he was stopped between inspection sites within the Port of Entry) and he had been across the geographic border for mere minutes, not (as Balde had been) for years.

*Lopez-Perera*'s legal reasoning, moreover, does not help Balde. In holding that § 922(g)(5)(A) requires an "entry," the Ninth Circuit deferred to a regulation promulgated by the then-Bureau of Alcohol, Tobacco and Firearms ("ATF"). *See id.* at 934–35. That regulation defines "[a]lien[s] illegally or unlawfully in the United States" as noncitizens who "are not in valid immigrant, nonimmigrant or parole status," including (among other categories) any noncitizen "[w]ho

16

unlawfully entered the United States without inspection and authorization by an immigration officer and who has not been paroled into the United States under [8 U.S.C. § 1182(d)(5)(A)]." 27 C.F.R. § 478.11. The Ninth Circuit concluded that Lopez-Perera was not within this definition because he "was never free from official restraint and, therefore, never entered the United States." *Lopez-Perera*, 438 F.3d at 935.

The ATF regulation does not help Balde for three reasons. First, the regulation does not purport to define being "in the United States" as requiring an entry. Rather, it defines the entire phrase "[a]lien illegally or unlawfully in the United States," thus conflating the two issues Balde wishes to separate. Second, it primarily defines that term as referencing noncitizens "not in valid immigrant, nonimmigrant, or parole status," thus focusing primarily on what makes their presence unlawful rather than on what constitutes being "in" the country, and it does so in a way that encompasses Balde, who has never had a valid immigrant or non-immigrant visa and is not, as explained in Part II below, in "parole status." And third, the language of the regulation referencing noncitizens who have "entered" the United States is provided only as one *example* of those covered by that definition; another category that is covered is "any alien . . .

[u]nder an order of deportation, exclusion, or removal, . . . whether or not he or she has left the United States." 27 C.F.R. § 478.11. That category makes no reference to whether or not the individual ever technically effected an "entry" into the United States and by its plain language includes Balde, who was under an order of removal when he was found in possession of a firearm. Thus, however it might have affected Lopez-Perera, when read properly and fully the regulation offers no support to Balde's argument.

In any event, we are not required to defer to the ATF's interpretation. Since *Lopez-Perera* was decided, the Supreme Court has clarified that law enforcement agency interpretations of criminal statutes are not entitled to deference: "Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly . . . , a court has an obligation to correct its error." *Abramski v. United States*, 573 U.S. 169, 191 (2014); *see also United States v. Gayle,* 342 F.3d 89, 93 n.4 (2d Cir. 2003) (noting that this Court had requested additional briefing on the issue of deference and that both parties had agreed that a definition in 27 C.F.R. § 478.11 was not entitled to deference); *United States v. Garcia,* 707 F. App'x 231, 234 (5th Cir. 2017) ("Following the Supreme Court's instruction that no deference is owed to agency interpretations of criminal statutes, specifically the ATF's

18

interpretation of 18 U.S.C. § 922, we decline to show deference to the ATF regulation interpreting § 922(g)(5)(A).").

Given these considerations, we decline to adopt the rule that Balde asks us to derive from *Lopez-Perera.* We conclude instead that the "in the United States" element of 18 U.S.C. § 922(g)(5)(A) requires only that a noncitizen be physically present within the United States. It is uncontested that Balde was physically present here, and so the facts charged in the indictment and admitted in his guilty plea allocution satisfy that element of the offense.

## II.    "Illegally or Unlawfully" Present

Balde next argues that, even if he was "in" the United States within the meaning of the statute at the time of the alleged crime, he was not then present "illegally or unlawfully" because he had been effectively paroled into the country when he was released from detention in 2007. His argument essentially rests on what at best amounts to an administrative mistake. Balde did not seek parole as that status is defined in 8 U.S.C. § 1182(d)(5)(A), nor did the government understand itself to be granting him parole at the time it released him from detention. Balde argues, however, that, because he had not been finally ordered removed when he was released from detention, the only statutory authority

19

under which ICE could have released him was the parole authority. Since Balde should not have been found eligible for the program under which he sought and was granted supervised release, he reasons, he must have been, *sub silentio*, granted parole.

It is helpful to contextualize Balde's argument by reviewing the various statutory authorities providing for the detention of noncitizens. The government's authority to detain an individual depends in part on whether that person is seeking admission to the United States or, once having entered, is removable for some reason. *See, e.g.*, 8 U.S.C. § 1226(c) (describing certain categories of noncitizens subject to mandatory detention); 8 U.S.C. § 1225(b)(2)(A) (describing detention during pendency of inadmissibility proceedings). Any lawful immigration status that Balde had when he left the United States had been revoked before he returned. Thus, when he arrived at the airport, he was treated as seeking admission. And an alien seeking admission, like Balde, "shall be detained" pending a removal proceeding "if the examining immigration officer determines that [he] is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A).

The government may also "parole" any noncitizen "applying for

admission" into the United States "temporarily under such conditions as [it] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole does not change parolees' immigration status: they remain "at the border" for the purposes of immigration law and are treated as applicants for admission into the country. *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007). But parolees' physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011) ("In other words, the United States accepts an alien paroled under § 1182(d)(5)(A) into the country for as long as the humanitarian or public benefit purpose persists."); *see also United States v. Al Sabahi*, 719 F.3d 305, 309 (4th Cir. 2013) (relying on 27 C.F.R. § 478.11 to note that a defendant is "not illegally or unlawfully in the United States if [he or she is] in valid parole status"); *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 259 (B.I.A. 2010) ("An alien paroled into the United States under section 212(d)(5) of the Act *is authorized to come into the United States* 'temporarily' for urgent humanitarian reasons or significant public benefit and under strict conditions defining his or her status. After the purpose of the

parole has been served, the alien returns to custody, and his or her case is dealt with in the same manner as any other applicant for admission.") (emphasis added).

Balde does not dispute that, when he presented himself at the airport on his return from Guinea, he was detained, not paroled, within the meaning of these provisions. His argument focuses, rather, on what happened thereafter, during the lengthy process of adjudicating the government's effort to remove him.

If a noncitizen is administratively determined to be inadmissible, a removal order is entered and further immigration detention is governed by 8 U.S.C. § 1231. The government is required to detain such an individual during the "removal period," the 90-day period (extendable under certain circumstances, *see* 8 U.S.C. § 1231(a)(1)(c)), that begins on either (1) "[t]he date the order of removal becomes administratively final," (2) the date of a final order from a Court of Appeals "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal," or (3) the date of release from criminal detention or confinement. *See id.* § 1231(a)(1)(B), (2). If, at the end of the removal period, the individual still has not been removed, he or she may be released

"subject to supervision under regulations prescribed by the Attorney General."
*Id.* § 1231(a)(3). But an individual deemed inadmissible by reason of criminal conduct, or one who is deemed a danger to the community or a risk not to comply with the order of removal, "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in [8 U.S.C. § 1231(a)(3)]." *Id.* § 1231(a)(6). Even for individuals detained beyond the removal period, however, continued detention is presumptively limited to six months unless their removal is "reasonably foreseeable." *Clark v. Martinez*, 543 U.S. 371, 378 (2005); *see also Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

At the time ICE granted Balde's application for supervised release, he appears to have fallen outside the categories for which such release was available. He was required to be detained when he presented himself at the border and was not admitted or paroled. And once a stay had been granted by this Court pending appeal, until the final resolution of the appeal Balde had not entered the "removal period," let alone reached the expiration of that period, at which point he would become eligible for release under the conditions set forth in § 1231(a)(3). *See* 8 U.S.C. § 1231(a)(6).

In the documentation accompanying Balde's release from detention, ICE

23

stated that it was reviewing his continued detention pursuant to 8 C.F.R. § 241.4. That regulation states that it addresses the government's "authority to continue an alien in custody or grant release [under 8 U.S.C. § 1231(a)(6)] or parole under [8 U.S.C. § 1182(d)(5)(A)]." *Id.* § 241.4. Balde argues that he could not have been granted release under § 1231(a)(6), even though the documentation suggests that is what ICE contemplated, because his appeal was still pending and thus the removal period had not begun. He therefore argues that, if ICE released him pursuant to 8 C.F.R. § 241.4, we should construe that release as parole.

Nothing in the record, however, suggests that Balde applied for, or that the government granted, humanitarian parole. Instead, Balde wrote that he was seeking supervised release, and the government released him under the ISAP program, which provides for the kind of release he requested. If, as Balde contends, he was in fact ineligible for that program because he was not yet subject to a final order of removal, that would mean at most that the government may have been without authority to release Balde from detention when it did. But that does not convert his release into his being paroled into the country within the meaning of 8 U.S.C. § 1182(d)(5)(A), given the absence of any explicit determination by the government that such parole was contemplated and any

24

consideration of whether the "urgent humanitarian reasons or significant public benefit" required for such discretionary relief existed. Indeed, Balde does not argue that such reasons existed in his case.

Balde also does not contend that any individual under an order of removal who is properly released under supervision pursuant to § 1231(a)(6) is lawfully present in the United States for purposes of 18 U.S.C. § 922(g)(5)(A), and any such contention would be unpersuasive in any event. A noncitizen who has been found to be inadmissible and ordered removed is not lawfully in the United States, whether he remains in detention or has been granted conditional liberty under supervision while awaiting execution of the order of removal. Release on supervision makes it lawful for such a person to be outside of jail; it does not change his or her immigration status. *Cf. United States v. Bravo-Muzquiz*, 412 F.3d 1052, 1055 (9th Cir. 2005) (noncitizen's release from custody on an immigration bond does not change his otherwise unlawful status). An alien under an order of removal who has not been paroled, and who is permitted supervised release in error when he had not yet become eligible for such release by virtue of expiration of his removal period (such as Balde), can have no greater lawful status than one who was properly released under § 1231(a)(6).

In any event, whatever may have been the case at the moment of Balde's release from detention and admission to the ISAP program, the key inquiry for purposes of § 922(g)(5)(A) is whether a noncitizen "lacks lawful immigration status on the date charged in his indictment." *United States v. Lucio*, 428 F.3d 519, 525 (5th Cir. 2005); *see also United States v. Latu*, 479 F.3d 1153, 1157 (9th Cir. 2007) (noting that defendant was "found to be in possession of a handgun on May 15, 2004," and therefore "[t]o sustain a conviction under § 922(g)(5)(A), the government must prove that, *on that date*, [he] was 'illegally or unlawfully in the United States'") (emphasis added). There is no dispute that, when Balde committed the conduct for which he was indicted, a final order of removal had been entered against him, even if the government was unable to remove him at that point, and had exceeded the 90-day removal period. Therefore, by that time, his continued supervised release from detention was firmly within the authority provided by 8 U.S.C. § 1231(a)(6) and would not constitute parole.

Having determined that Balde was not paroled, we have little trouble concluding that he is within the category of individuals prohibited by § 922(g)(5)(A) from possessing a firearm. In enacting the statutory scheme, Congress decided that, except for very limited categories of persons, noncitizens

26

who are not lawful permanent residents should be prohibited from possessing a firearm in or affecting commerce. *See generally* 18 U.S.C. § 922(g)(5). Its choice of language, which prohibits firearm possession both by most holders of non-immigrant visas and by all those unlawfully present, covers large numbers of those who have temporary authorization to enter the country, *id.* § 922(g)(5)(B), as well as those who have no such authorization, *id.* § 922(g)(5)(A). The facts of Balde's case make clear that he is in the latter category: he has been finally adjudicated to be unlawfully present. Permission to reside at liberty under supervised conditions rather than in immigration detention does not equate to a conferral of lawful status in the country, and therefore does not confer permission to possess firearms. Our sister circuits have upheld convictions under § 922(g)(5)(A) of individuals who had an application for relief pending or who were in removal proceedings that were still in process and had not yet resulted in entry of a final removal order. *See, e.g.*, *Latu*, 479 F.3d at 1158–59 (affirming conviction of defendant who had pending application for adjustment of status); *United States v. Atandi*, 376 F.3d 1186, 1190 (10th Cir. 2004) (finding defendant was illegally or unlawfully present when he failed to satisfy conditions of student visa, concluding "[t]he fact that he had not yet been ordered removed is not

27

relevant to the question of whether or not his presence in the United States was then authorized"). We see no principled reason why such individuals should be considered to be unlawfully present, even before entry of a final removal order, while Balde, whose removability had been fully litigated resulting in a final determination that he had no legal right to be in the United States, should not be.

Accordingly, in light of Balde's immigration status at the time of the conduct underlying his arrest, we conclude that he was in the United States "illegally or unlawfully" within the meaning of § 922(g)(5)(A).

## III. *Rehaif* and Balde's Knowledge of His Unlawful Status

Shortly after we issued our initial opinion in this case, the Supreme Court decided *Rehaif*, 139 S. Ct. at 2194. Hamid Rehaif had originally entered the United States on a student visa, but he received poor grades and was ultimately dismissed from school. *Id.* The university he had been attending told him that, because he would no longer be a student, he would also lose his immigration status unless he transferred to a different university or left the country. *Id.* Rehaif later went to a shooting range and shot two firearms. The government subsequently prosecuted him for this target practice, charging him with "possessing firearms as an alien unlawfully in the United States, in violation of

28

§ 922(g) and § 924(a)(2)." *Id.* The jury found Rehaif guilty after the trial judge, over the defendant's objection, instructed the jury that the government was not required to prove that Rehaif knew that he was illegally or unlawfully in the United States. *Id.* The Court of Appeals for the Eleventh Circuit affirmed, and Rehaif petitioned for certiorari, arguing that the government had to demonstrate that he knew *both* that he possessed a firearm *and* that he was a member of a prohibited category of persons. *Id.* at 2195.

The Supreme Court reversed the conviction. Applying the presumption in favor of *scienter*, the Court "conclude[d] that in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200. It remanded to the district court to consider, in the first instance, whether any error in the jury instruction was harmless. *Id.*

In his petition for rehearing, Balde argues that *Rehaif* requires reversal of his conviction. He makes two arguments, in each case both arguing the merits of a claim of error in the proceedings below and seeking to avoid the anticipated challenge that any error should be overlooked because he failed to raise the

29

argument below – or, for that matter, in the initial briefing of his appeal.

First, he frames his challenge as a jurisdictional one. Balde argues that *Rehaif*'s newly articulated knowledge requirement is an essential element of any prosecution under 18 U.S.C. §§ 922(g) and 924(a)(2). Because it is an essential element, he argues, the government's failure to plead knowledge means that the indictment does not charge a federal crime, and therefore does not vest the district court with jurisdiction over the prosecution. Second, he argues that, even if the defect is not jurisdictional, his plea was not knowing and voluntary because he was not informed that the government would be required to prove that he knew he was illegally or unlawfully in the United States in order to convict him. He therefore argues that he was not informed of the true nature of the charge, and that the record fails to establish a factual basis for his plea in violation of Fed. R. Crim. P. 11(b)(3). These errors, he contends, warrant reversal under the plain error standard.

In response, the government does not dispute that Balde pled guilty without being advised of or admitting to knowing he was in the United States unlawfully, a mental state that is indeed, as is now clear after *Rehaif*, an element of the offense. Instead, it contends that by pleading guilty without raising in the

district court or preserving for appellate review any objection to the indictment or his conviction on that ground, Balde has waived or forfeited the issue. Even if the issue is not waived so as to preclude review on appeal entirely, the government argues, his failure to object would limit our review to the correction of plain error, and Balde cannot meet that demanding standard of review.

We disagree with Balde that the indictment's failure to allege in explicit terms that he knew he was "illegally or unlawfully in the United States," and therefore prohibited from possessing a gun under 18 U.S.C. § 922(g)(5)(A), is a jurisdictional defect. But while the district court had jurisdiction, we conclude that Balde was not fully informed as to the nature of the charge against him and therefore could not have waived his *Rehaif* argument. And, because we find he can demonstrate plain error, we must vacate his conviction despite his failure to object and remand to the district court for further proceedings.

### A. Jurisdiction

Balde attempts to avoid the plain error standard of review by arguing that, in failing to allege that he had actual knowledge of his immigration status, the indictment failed to allege a federal crime, and that this defect deprived the district court of jurisdiction. The effort to characterize the argument as

31

jurisdictional is important because, as we have explained, a "defendant's plea of guilty admits all of the elements of a formal criminal charge and, in the absence of a court-approved reservation of issues for appeal, waives all challenges to the prosecution *except those going to the court's jurisdiction.*" *United States v. Yousef*, 750 F.3d 254, 258 (2d Cir. 2014) (quoting *Hayle v. United States*, 815 F.2d 879, 881 (2d Cir. 1987)) (emphasis added). Balde relies on *Yousef*'s definition of such a jurisdictional inquiry as one in which "[w]e ask only whether 'the indictment alleges all of the statutory elements of a federal offense.'" *Id.* at 259 (quoting *Hayle*, 815 F.2d at 882).

Federal courts, as courts of limited jurisdiction, have subject matter jurisdiction only where Congress has conferred such jurisdiction on them. Congress has granted the district courts jurisdiction over federal criminal prosecutions in 18 U.S.C. § 3231. That statute provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." *Id.* Jurisdiction is vested in the federal courts when a proper indictment is filed: "[i]f the indictment alleges an offense under U.S. criminal statutes, the courts of the United States have jurisdiction to adjudicate the claim." *United States v. Prado*, 933 F.3d 121, 134

32

(2d Cir. 2019). "If the facts fail to show a violation, the court enters judgment for the defendant. It does not dismiss the case for lack of jurisdiction, leaving the case unadjudicated." *Id.*; *see also Yousef*, 750 F.3d at 260 ("Even a defendant's persuasive argument that the conduct set out in the indictment does not make out a violation of the charged statute does not implicate subject-matter jurisdiction.").

A *jurisdictional* argument — *i.e.* one that would survive waiver by a valid guilty plea — is one where a defendant demonstrates that the "face of the indictment discloses that the count or counts to which he pleaded guilty failed to charge a federal offense." *Yousef*, 750 F.3d at 259 (quoting *Hayle*, 815 F.2d at 881); *see also United States v. Bastian*, 770 F.3d 212, 217 (2d Cir. 2014) ("A defect qualifies as jurisdictional only if it alleges that the face of the defendant's indictment discloses that the count to which he pleaded guilty failed to charge a federal offense, such that the district court lacked the power to entertain the prosecution.") (internal quotation marks and alterations omitted).

But in criminal cases, as in civil actions, there is a distinction between a lack of jurisdiction and a failure to state a claim. And while an indictment that utterly fails, on its face, to charge any federal offense may fail to establish the

33

jurisdiction of the federal court, the standard for the sufficiency of an indictment

is not demanding. We have required that, in order to sufficiently charge a crime,

an indictment must "do little more than . . . track the language of the statute

charged and state the time and place (in approximate terms) of the alleged

crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United*

*States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)).

There is little doubt that the indictment here *alleges* the violation of a

federal criminal offense, specifically invoking 18 U.S.C. § 922(g)(5).[4] The text of 18

U.S.C. § 922(g)(5)(A) provides that "[i]t shall be unlawful for any person . . . who,

being an alien[,] is illegally or unlawfully in the United States . . . to . . . possess in

or affecting commerce, any firearm or ammunition; or to receive any firearm or

ammunition which has been shipped or transported in interstate or foreign

commerce."  The indictment tracks that language, alleging:

> On or about December 14, 2015, in the Southern District
> of New York, SOULEYMANE BALDE, the defendant,
> being an alien illegally and unlawfully in the United
> States, knowingly did possess in and affecting
> commerce, a firearm and ammunition, to wit, a Rossi,
> Model 685, 38 Special caliber revolver, and 38 Special

---

[4] The indictment cites "Title 18, United States Code, Sections 922(g)(5) and 2."
App'x at 17.

caliber cartridges, manufactured by Remington Peters, all of which previously had been shipped and transported in interstate and foreign commerce.

App'x at 17.

That indictment, which clearly would have been sufficient before *Rehaif*, closely tracks the language of the statute while including specific allegations as to the time, place and nature of Balde's conduct that is alleged to constitute a violation of § 922(g)(5)(A). The indictment does not expressly charge that Balde was aware that his particular and unusual immigration situation rendered him "illegally or unlawfully" in the United States, but then, neither does the language of the statute itself, which the Supreme Court held to require such knowledge, expressly reference that state of mind. If, as the Supreme Court held, the language of the *statute* includes a requirement that the defendant must have knowledge of his illegal status, it is difficult to understand how an *indictment* that tracks the exact language of the statute, and that expressly charges that the defendant violated it, fails on its face to charge that the defendant committed a federal crime.

Our recent decision in *United States v. Prado*, 933 F.3d 121 (2d Cir. 2019), is instructive. *Prado* addressed the requirement for a conviction under the Maritime

35

Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 *et seq.*, that the prohibited controlled substance offense occur aboard a vessel "subject to the jurisdiction of the United States." 933 F.3d at 130. One way in which the government can demonstrate that a given vessel falls within the jurisdiction of the United States is by showing that the vessel was stateless. 46 U.S.C. § 70502(c)(1)(A). The defendants in *Prado* had been interdicted by the United States Coast Guard in international waters, 300 nautical miles from the Central American mainland near the Nicaraguan border with Costa Rica. 933 F.3d at 126. They were carrying a shipment of cocaine in a "go-fast," a small speedboat. The defendants were indicted in the Southern District of New York, and the prosecution proceeded on the theory that the vessel was stateless. *Id.* at 127. The defendants eventually pled guilty, but they then appealed the district court's finding that the "go-fast" was stateless and, therefore, "subject to the jurisdiction of the United States" as required by the MDLEA. *Id.* On appeal, they argued that this MDLEA requirement was jurisdictional, such that their guilty pleas had not waived the challenge. *Id.*

Noting that jurisdiction is a "chameleon word," the *Prado* Court recognized that an issue is properly considered jurisdictional, and therefore cannot be

36

waived by a guilty plea, if it speaks to "the question whether a case comes within the judicial power of the court." *Id.* at 132-33. The limitation of the controlled substance offenses criminalized under the MDLEA to conduct occurring on a "vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(e)(1), did not limit the grant of judicial jurisdiction to the district courts contained in 18 U.S.C. § 3231. Instead, the Court reasoned, the reference to the "jurisdiction of the United States" limited the reach of the prohibited conduct to conduct occurring on the sorts of vessels that Congress sought to regulate. *Prado*, 933 F.3d at 136. Thus, the requirement that the offending conduct must occur on a covered vessel is a question of "what conduct [the statute] prohibits, which is a merits question" and not jurisdictional in the sense relevant to the waiver issue. *Id.* at 138 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)).

*Rehaif*'s knowledge requirement functions in a similar way; it details what *conduct* violates 18 U.S.C. § 922(g)(5)(A). Conduct that does not include actual knowledge of being in the United States unlawfully, the Supreme Court ruled, is not sufficient to convict a defendant. The knowledge requirement therefore is best understood as telling us "what conduct [the statute] prohibits" and how the statute would be violated, which is ultimately a merits question and not one that

37

affects the jurisdiction of the court to adjudicate the case. *Prado*, 933 F.3d at 137. Therefore, an indictment that does not clearly indicate that the defendant is required to know he or she is in a prohibited category may be deficient in some way (and the government may avoid claims of such deficiencies by taking care to correctly state the requirement in future indictments), but its absence does not mean that the indictment fails to allege a federal offense in the sense that would speak to the district court's power to hear the case. *See, e.g., Yousef*, 750 F.3d at 259.

This approach is well supported in our case law. It is true, as Balde points out, that we have previously described jurisdictional challenges as ones in which "[w]e ask only whether the indictment alleges all of the statutory elements of a federal offense." *Id.* (quotation marks omitted). But *Yousef*, and *Hayle*, from which *Yousef* quotes this assertion, relied on that standard only to reject defendants' arguments that their challenges were jurisdictional. In other words, *Yousef* and *Hayle* hold that when all elements of a federal statute are alleged, that is sufficient to *defeat* a defendant's attempt to escape a waiver by arguing that a putative flaw in the prosecution was jurisdictional. That holding does not, however, entail the converse conclusion that an indictment that expressly alleges a violation of a

38

federal criminal statute, but omits a required element of that crime, deprives the district court of jurisdiction. As *Yousef* itself recognizes, "[e]ven a defendant's persuasive argument that the conduct set out in the indictment does not make out a violation of the charged statute does not implicate subject-matter jurisdiction." *Id.* at 260.

Courts have regularly rejected arguments that the failure to include certain elements in an indictment, even when that element must be proven beyond a reasonable doubt to secure a conviction, deprived the district court of subject matter jurisdiction. For instance, we have repeatedly concluded that the failure to include in an indictment required elements, such as drug quantities or the value of stolen property, was a non-jurisdictional error, even though the elements were statutory elements that the government would have to prove beyond a reasonable doubt at trial. In *United States v. Lee,* the government had tried the defendant based on a superseding indictment that did not allege the value of the stolen property, even though the government's requested jury instructions conceded that the value was an element that had to be found by the jury beyond a reasonable doubt. 833 F.3d 56, 62-63 (2d Cir. 2016). The defendant argued that, as a result, the government could not try him for a felony, which required a

threshold value of stolen goods. But we ultimately "conclude[d] that in the circumstances of this case, the failure of the [superseding] Indictment to allege that the value of the stolen pallets exceeded $1,000 was error — but an error that was harmless beyond a reasonable doubt." *Id.* at 64; *see also United States v. Dupree,* 870 F.3d 62, 71-72 (2d Cir. 2017) (noting that drug quantity was an "essential fact" that had to be included in indictment, but reviewing indictment's deficiency under a plain error standard). We have also upheld the sufficiency of indictments in other cases where the indictments failed to plead key elements. *See, e.g., United States v. Bout*, 731 F.3d 233, 240-41 (2d Cir. 2013) (sustaining indictment that failed to allege with precision all required elements of conspiracy to commit murder charge); *United States v. Nkansah*, 699 F.3d 743, 752 (2d Cir. 2012), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014) (sustaining indictment that omitted required interstate commerce element of identity theft charge).

Similarly, the Supreme Court has rejected the argument that the omission from an indictment of a drug quantity is a "jurisdictional" defect. *United States v. Cotton*, 535 U.S. 625, 631 (2002). The district court in *Cotton* had imposed enhanced sentences on the defendants based on its determination of the quantity

40

of drugs at issue in the prosecution. While their appeal was pending, however, the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which mandated that the factual predicates necessary to enhance the penalty would have to be found by a jury and proved beyond a reasonable doubt. The Court of Appeals vacated the sentences, concluding that an "indictment setting forth all the essential elements of an offense is both mandatory and jurisdictional [and] a court is without jurisdiction to impose a sentence for an offense not charged in the indictment." *Cotton*, 535 U.S. at 629 (internal quotation marks and alterations omitted). The Supreme Court reversed, ruling that the failure to allege the drug quantity in the indictment rendered the indictment defective, but did not deprive the court of jurisdiction. *Id.* at 631. It therefore reviewed respondents' claims for plain error. *Id.*[5]

---

[5] Our sister circuits have also rejected arguments that the failure of an indictment specifically to allege the requisite mens rea deprived a district court of jurisdiction. *See, e.g., United States v. Ketchen*, 877 F.3d 429, 433 & n.2 (1st Cir. 2017) ("Additionally, Ketchen argues that his conviction should be vacated due to the government's alleged failure adequately to plead scienter in the indictment. . . . Because the alleged defect in the indictment is non-jurisdictional, and because we have found that Ketchen's plea was knowing and voluntary, Ketchen has waived this argument."); *United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (concluding that omission of "the required mens rea, an essential element of the [18 U.S.C.] § 473 crime" was "not jurisdictional and was waived by Brown's guilty plea").

Finally, in *Rehaif* itself the Supreme Court did not vacate the conviction and remand with instructions to dismiss the indictment, as it would have been required to do had the error it identified been jurisdictional. The Court instead remanded for the lower courts to consider whether any error in the jury instructions was harmless. 139 S. Ct. at 2200. The Eleventh Circuit in turn remanded to the district court to "consider in the first instance whether the district court's error in failing to instruct the jury that the government must prove that Rehaif knew he was illegally or unlawfully in the United States was harmless such that the conviction can be affirmed." *United States v. Rehaif*, 776 F. App'x 653, 654 (11th Cir. 2019). And while *Rehaif*'s impact is only beginning to be addressed, courts have thus far unanimously applied a plain error standard in addressing convictions obtained before that decision, at times when the circuits uniformly held that the knowledge element identified in *Rehaif* did not need to be alleged in an indictment, found by a jury, or proven beyond a reasonable doubt. *See United States v. Burghardt*, 939 F.3d 397, at 402-03 (1st Cir. 2019) *(*reviewing for plain error defendant's argument, on a petition for rehearing, that the government had failed to prove that defendant knew he was a felon); *United States v. Benamor*, 937 F.3d 1182, 1188 (9th Cir. 2019) (same); *United States v. Williams*, 776 F. App'x 387,

388 (8th Cir. 2019) (same); *United States v. Denson*, 774 F. App'x 184, 185 (5th Cir. 2019) (same).

In light of this body of authority, we conclude that the indictment's failure to allege that Balde knew that he was illegally present in the United States was not a jurisdictional defect. That conclusion has two implications for Balde's petition. First, because the defect is not jurisdictional, we must evaluate whether Balde has waived his ability to attack his conviction on grounds not reserved in his conditional guilty plea. Second, because of his failure to raise the issue in the district court, if he has not waived the issue, we must determine whether any error in the district court constituted plain error affecting substantial rights.

### B.    Waiver

The government argues that, by pleading guilty, Balde has waived any argument that the indictment failed to allege, and that he in fact lacked, the requisite knowledge of his status. The government raises two related waiver issues. First, the government notes that any "defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings." *Bastian*, 770 F.3d at 217 (internal quotation marks omitted). Second, the government points out that in addition to the waiver that would normally be

43

implicit in any guilty plea, Balde's plea agreement also included an explicit

appeal waiver:

> It is agreed (i) that the defendant will not file a direct
> appeal; nor bring a collateral challenge . . . nor seek a
> sentence modification . . . of any sentence within or
> below the Stipulated Guidelines Range of 18 to 24
> months' imprisonment and (ii) that the Government will
> not appeal any sentence within or above the Stipulated
> Guidelines Range. . . . Additionally, notwithstanding the
> foregoing, pursuant to Federal Rule of Criminal
> Procedure 11(a)(2), the defendant, with the
> Government's consent, expressly reserves the right to
> appeal the portion of the district court's December 2,
> 2016 ruling denying the defendant's motion to dismiss
> in which the district court ruled that the defendant's
> immigration status renders his presence in the United
> States "unlawful" or "illegal" for purposes of 18 U.S.C.
> § 922(g)(5). . . . The defendant agrees not to file a direct
> appeal of any other aspect of his conviction.

*See* Plea Agreement at 3-4, *United States v. Balde*, No. 1:16-cr-130-KPF (S.D.N.Y.

2017), ECF No. 55. The government argues that Balde reserved only his right to

appeal the district court's denial of his motion to dismiss, which addressed

whether he was in fact "illegally or unlawfully in the United States," and

therefore Balde may not raise an additional, new *Rehaif*-based argument on

rehearing.

The government's waiver argument, however, necessarily assumes a valid

plea that was knowingly and intelligently entered in compliance with the requirements of Rule 11 of the Federal Rules of Criminal Procedure. As we held in *United States v. Lloyd*, 901 F.3d 111, 118 (2d Cir. 2018), "[a]n appeal waiver included in a plea agreement does not bar challenges to the process leading to the plea. Challenges that typically survive appeal waivers include those asserting that the district court failed to comply with the important strictures of Rule 11, which governs entry of guilty pleas." *See also Prado*, 933 F.3d at 151 ("The rule advocated by the government — that a guilty plea waives all defects except to the court's jurisdiction —applies only to valid guilty pleas," and concluding that the pleas in that case were defective).

In *Lloyd*, we refused to enforce an appeal waiver where the district court had failed to "explain to [the defendant] the elements of the crimes to which he was pleading guilty." 901 F.3d at 121. Failing to do so resulted in a defective plea, although Lloyd ultimately failed to "demonstrate that, had the District Court articulated each element of the offense to which he pleaded guilty, he would not have entered the plea." *Id.* at 122. This Court therefore applied the plain error standard and affirmed the conviction. *Id.* at 119, 122.

Similarly, in *Prado,* we again refused to enforce a waiver, this time

ultimately vacating the defendants' guilty pleas. We noted that the prosecution hinged on whether the vessel was stateless, a key threshold issue under the MDLEA. But there was "no basis for a finding that the vessel was unregistered, or otherwise subject to the jurisdiction of the United States." *Prado*, 944 F.3d at 153. The record did not demonstrate that the defendants understood this critical requirement, and therefore the district court had failed to properly inform the defendants of the nature of the charge. *Id.* at 152 (citing Fed. R. Crim. P. 11(b)(1)(G)). Moreover, in the absence of an admission or other evidence demonstrating the statelessness of the vessel, the district court had failed to ensure that there was an adequate factual basis for the plea. *Id.* at 153 (citing Fed. R. Crim. P. 11(b)(3)). The defendants' guilty pleas were therefore defective under Rule 11.

Because of the Supreme Court's intervening decision in *Rehaif*, Balde's plea is now similarly deficient under Rule 11. That, of course, was through no fault of the district court: the court was merely applying what had long been the law of the circuit in requiring knowledge only of the possession of the firearm. But in interpreting the statute, *Rehaif* instructs us about what § 922(g)(5)(A) has always meant. *Cf. Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13 (1994) ("A judicial

construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."). In evaluating Balde's claims of error, therefore, we must look to the law as clarified by the Supreme Court in *Rehaif*.

First, Rule 11 requires that the district court "inform the defendant of, and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G). At Balde's change of plea hearing, in order to comply with this requirement, the district court requested that the government describe the elements of the offense. Transcript of Plea Proceedings at 14:3-4 ("Plea Transcript"), *United States v. Balde*, No. 1:16-cr-130-KPF (S.D.N.Y. 2017), ECF No. 56. In responding to that request, the government did not say anything that would have put Balde on notice that his knowledge of his status was an element of the offense:

> THE PROSECUTOR: Yes, your Honor, Count One of the indictment has four elements: First, that the defendant possessed a firearm or ammunition; second, that the possession was knowing; third, that the firearm or ammunition traveled in interstate commerce; and, fourth, that at the time the

<pre>
                              defendant possessed the
                              firearm or ammunition, the
                              defendant was an alien in the
                              United States unlawfully or
                              illegally. . . .

THE COURT:                    Thank you for letting me know that.
                              Mr. Balde, were you able to hear the
                              prosecutor a moment ago?

THE DEFENDANT:                Yes, your Honor.

THE COURT:                    And do you understand that if
                              you were to go to trial, these
                              are the elements that the
                              government would have to
                              prove against you beyond a
                              reasonable doubt?

THE DEFENDANT:                Yes, your Honor.
</pre>

Plea Transcript at 14:3-24. Because Balde was not informed about the requisite

mens rea standard, we now know that he was not properly informed as to the

"nature of each charge to which [he was] pleading" guilty. Fed. R. Crim. P.

11(b)(1)(G); *see also Prado*, 933 F.3d at 152-53 (vacating plea where court had failed

to inform defendants of "crucial issue of [the vessel's] statelessness").

Second, Rule 11(b)(3) requires that "[b]efore entering judgment on a guilty

plea, the court must determine that there is a factual basis for the plea." In part to

preserve Balde's ability to appeal the district court's ruling regarding his status, the parties agreed to a rather limited allocution regarding the facts of the case. The government proferred that Balde was "not a citizen of the United States; he did not have a valid immigrant visa, green card or lawful permanent residence status" and he was under supervision, Plea Transcript at 39:4-7, and that a "final order of removal was in effect against the defendant at the time of the offense and no formal grant of deferred action or judicial stay had been obtained." *Id.* at 41:13-16. As the district court recognized, these "are facts from which I can make the determination that the third prong of the 922(g)(5) offense is met and that at the time of the offense Mr. Balde *was* an alien illegally or unlawfully in the United States." *Id.* at 41:21-25 (emphasis added). Those facts did not, however, establish a basis for the district court to conclude that Balde *knew* that he was illegally or unlawfully present in this country, and the district court did not purport to draw any such conclusion. Without that second inquiry, the plea proceeding did not adequately ensure a factual basis for a guilty plea in light of the Supreme Court's decision in *Rehaif*. *Cf. United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (concluding that "there was not a sufficient factual basis in the record to support the plea at the time the district court accepted it" where defendant "insisted that

49

he knew of and agreed to only a marijuana conspiracy" and not the charged cocaine conspiracy).

Both of these requirements are at the heart of the plea process. Without being fully informed of the nature of the offense, and without an established factual basis for finding that one of its elements was satisfied, it is hard to imagine how a defendant's plea could be knowing and voluntary. *Lloyd*, 901 F.3d at 118 ("The interactions between the district court and the defendant that Rule 11 directs are a mandated part of the guilty plea procedure, because the drafters of Rule 11 clearly deemed that advising the defendant of the matters in the Rule was necessary for a guilty plea to be considered knowing and voluntary.") (internal quotation marks and alterations omitted). And because, as we explain in more detail below, the record does not contain any information establishing Balde's knowledge of his unlawful status, neither of these errors, alone or taken together, would constitute harmless error. *See* Fed. R. Crim. P. 11(h) ("A variance from the requirements of this rule is harmless error if it does not affect substantial rights.").

We therefore conclude that Balde has not waived his ability to attack his plea under *Rehaif,* either by pleading guilty generally or by agreeing to an appeal

50

waiver provision.

## C.     Plain Error

Although Balde's objections to the validity of his plea are not waived, the fact that he did not raise those objections below is not without significance. It is well-settled that such claims, if not waived and not jurisdictional, are reviewed according to the plain error standard. *See, e.g., Lloyd*, 901 F.3d at 119; *United States v. Cook*, 722 F.3d 477, 480-81 (2d Cir. 2013).

Balde did not argue below that the government would be required (and unable) to prove that he knew he was "illegally or unlawfully in the United States" within the meaning of 18 U.S.C. § 922(g)(5)(A). Nor did he object at any time in the district court, or even in his initial brief on appeal, to the district court's failure to advise him of that element or to determine that there was a factual basis for concluding that the element was satisfied. In its response to Balde's petition for rehearing, the government argues that we may review his present arguments on those issues only for plain error, and that Balde is unable to demonstrate plain error. We agree that the plain error standard applies, but conclude that on the facts of this case the error satisfies that standard.

"Under the plain error standard, an appellant must demonstrate that (1)

51

there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Bastian*, 770 F.3d at 219-20 (internal quotation marks and alterations omitted). Within the context of plea proceedings, "a defendant must establish that the violation affected substantial rights and that there is a 'reasonable probability that, but for the error, he would not have entered the plea.'" *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (quoting *United States v. Vaval*, 404 F.3d 144, 151 (2d Cir. 2005)).[6]

All four prongs of the plain error analysis are met here. First, *Rehaif* establishes that knowledge on the part of an alien that he is unlawfully present in the United States is an element of the crime defined in § 922(g)(5)(A). The government argues that its burden under § 922(g)(5)(A) is solely "to establish that the defendant knew *the facts* that the law deems constitute 'illegal' status."

---

[6] We have sometimes applied a modified plain error standard where the error was the result of a supervening change in law. *See, e.g. Garcia,* 587 F.3d at 520 n.7. That approach was called into question after the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997). But we conclude that Balde has demonstrated plain error regardless of whether he or the government bears the burden, and so do not address the modified plain error standard here.

Appellee's Opp'n to Reh'g at 12 (emphasis in original). That argument was squarely rejected in *Rehaif*. The government argued there that, because ignorance of the law is not a defense to a criminal charge, it was not required to prove the defendant's knowledge that he was not legally present. The Court, however, following criminal law scholars and the Model Penal Code, noted that this rule applies where a defendant is unaware of the criminal statute prohibiting his conduct; it does not apply where, as here, the defendant is ignorant or mistaken about a "collateral" rule of law (such as the complex question of immigration law in this case), where such mistake negates a material element of the offense. *Rehaif*, 1395 S. Ct. at 2198 (citing 1 Wayne F. LaFave and Austin W. Scott, Substantive Criminal Law § 5.1(a) at 575 (1986), and Model Penal Code § 2.04 (Am. Law Inst. 1962)). Thus the Court expressly held that although "the defendant's status as an alien 'illegally or unlawfully in the United States' refers to a legal matter, . . . [a] defendant who does not know that he is . . . 'illegally or unlawfully in the United States' does not have the guilty state of mind" that § 922(g)(5)(A) requires. *Id.*

Accordingly, the failure of the district court to advise Balde that the government would need to establish beyond a reasonable doubt at trial that he knew that he was illegally present in the United States, or to examine the record

53

to determine whether there was a factual basis for finding such knowledge, was error.

Second, although the error was not "clear or obvious" at the time of the plea, it is well established that, in applying the plain error standard on direct appeal, the obviousness of the error is assessed as of the time of the appeal. *Garcia*, 587 F.3d at 520. While "[w]e typically do not find plain error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court," we do ask whether an error is "so egregious and obvious that a trial judge and prosecutor would be derelict *in permitting it in a trial held today*." *Bastian*, 770 F3.d at 220 (internal quotation marks omitted) (emphasis added). *Rehaif* settles this question: there is now binding Supreme Court precedent that "the Government . . . must show that [Balde] knew he possessed a firearm and also that he knew he had the relevant status when he possessed it." *Rehaif*, 139 S. Ct. at 2194.

Third, the error here affected Balde's substantial rights because there is a "reasonable probability that, but for the error, [Balde] would not have entered the plea." *Garcia*, 587 F.3d at 520 (internal quotation marks omitted). We can conceive of cases in which there would be a plausible argument that a *Rehaif*

54

error had no impact on a defendant's conviction by a jury, or decision to plead guilty. It could be argued, for example, that a defendant who had crossed the border into the United States surreptitiously and without inspection, or who had previously been deported and warned that he could not reenter without the Attorney General's permission, would have no realistic defense that he in good faith believed that he was legally present in the United States.

Balde's case, however, is different. Throughout the proceedings below, the nature of Balde's status was hotly contested. Balde vigorously argued, as discussed above, that he actually was legally present in the United States, if indeed he was (in the sense required by the law) present in the United States at all. Resolving those questions required multiple hearings before the district court in which an able and experienced judge found the questions difficult to resolve, a plea agreement that reserved Balde's right to appeal the district court's adverse conclusion, and ultimately this panel's lengthy original opinion addressing the complexities of Balde's immigration status. Balde, moreover, explicitly asserted below, both personally and through counsel, that he thought, at least by the time of the plea, that he had been paroled, and that parole would have constituted lawful status. *See* Plea Transcript at 36:2-5 (the district court asked whether Balde

55

had "parole status on that day," to which counsel answered, "I think he believes arguably that he did, your Honor" and Balde answered "Yes.").

We express no opinion, of course, as to what Balde in fact believed at the time of the shooting incident. That is a question for a jury, and the government would be free to argue at trial that, given the removal order pending against him, he must have known that he had no legal right to be in the United States, and that the legal argument he advanced in these proceedings was a lawyer's after-the-fact construct and not a reflection of what Balde believed when he possessed and fired a gun in December 2015. Nevertheless, we cannot conclude on the present record that the government's arguments are so strong that Balde would have had no plausible defense at trial and no choice but to plead guilty, even had he known of the element announced in *Rehaif*.[7] We are therefore satisfied that

---

[7] In a letter submitted pursuant to Rule 28(j), Fed. R. App. P., the government refers us to the recent decision of the First Circuit in *Burghardt*, 939 F.3d 397, as authority for rejecting Balde's claim of plain error. *Burghardt's* facts stand in stark contrast to those here, however. Burghardt, who pled guilty to being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), was not advised of the mens rea requirement announced in *Rehaif*. The First Circuit found that the error did not affect his substantial rights because the record "reveal[ed] no reason to think that the government would have had any difficulty at all in offering overwhelming proof that Burghardt knew that he had previously been convicted of offenses punishable by more than a year in prison." *Id.* at 404. The court noted that he had pled guilty to such crimes in the courts of New Hampshire, where the

Balde has demonstrated a "reasonable probability that, [had he been properly advised of what we now have been instructed are the elements of the offense], he would not have entered the plea." *Garcia*, 587 F.3d at 515 (internal quotation marks omitted).

Finally, we have little difficulty concluding that Balde has demonstrated that failing to correct the error would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Bastian*, 770 F.3d at 219-20. There is a significant possibility that Balde was permitted to plead guilty to a crime of which he was not guilty, as the Supreme Court now understands the elements of that crime. Where a defendant "has been convicted of and [received a prison] sentence for an offense of which there is a substantial possibility he is not guilty[, t]here can be no serious question that allowing [such an] error to stand would significantly affect the fairness and integrity of judicial proceedings." *Garcia*, 587 F.3d at 521.

---

law requires a court to advise the defendant of the maximum penalty for the crimes to which he seeks to plead guilty, and that Burghardt had in fact been sentenced, more than once, to more than a year in prison. *Id.* Nothing could be further from the facts of this case, in which Balde offered non-frivolous arguments that he was *not* illegally present, and the government, so far as the present record reflects, has no similar direct proof that Balde knew that he was illegally present.

We are therefore convinced that Balde has demonstrated plain error here, and that his guilty plea must be vacated.

## CONCLUSION

For the reasons set forth above, we GRANT Balde's petition for rehearing and WITHDRAW the prior opinion in this case. We VACATE his conviction and REMAND to the district court for further proceedings consistent with this opinion.